UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-mj-6022-STRAUSS

UNITED STATES OF AMERICA

v.

TRAMAINE MARVIN RANDALL,

    Defendant.
_____/

FILED BY ____AT____ D.C.
Jan 15, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Mills Maynard)?   No.

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No.

3. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?   No.

4. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   No.

                                                Respectfully submitted,

                                                MARKENZY LAPOINTE
                                                UNITED STATES ATTORNEY

                          By:     */s/ Alexandra D. Comolli*
                                    ALEXANDRA D. COMOLLI
                                    Assistant United States Attorney
                                    Court ID No. A5502803
                                    99 Northeast 4th Street
                                    Miami, FL. 33132-2111
                                    Tel: (305) 961-9040
                                    Fax: (305) 536-4089
                                    Alexandra.Comolli@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Tramaine Marvin Randall,<br><br>*Defendant* | )<br>)<br>) Case No. 25-mj-6022-STRAUSS<br>)<br>)<br>) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __January 14, 2025__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2156 | Animal Fighting Venture Prohibition |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Hunter I. Sargent, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __FaceTime__

Date: __01/15/2025__

_____
*Judge's signature*

City and state: __Fort Lauderdale, Florida__    Hon. Jared M. Strauss, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Hunter I. Sargent, first being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Transnational Organized Crime squad in the Miami Division. I have been an FBI Special Agent since June 2022. As a Special Agent, I have conducted and participated in multiple organized crime investigations and my duties and responsibilities involve the investigation of various violations of federal law, including organized criminal conspiracies, illegal animal fighting ventures, illegal gambling businesses, money laundering, among others. I have received training in how to conduct investigations of organized crimes, which includes illegal animal fighting ventures, money laundering, and the related statutes. I received training at the FBI Academy in various aspects of criminal investigations, such as witness and investigative interviews, search and arrest warrant operations, physical and electronic surveillance, and confidential human sources. As a result of my experience and studies in organized crimes and money laundering, I am familiar with the strategies, methods and techniques of organized criminal groups and I know that evidence of their illicit activities often is contained in electronic storage media, including emails, computers, cell phones, and thumb drives. Prior to becoming an FBI Special Agent, I was a commissioned officer in the U.S. Marine Corps where I served as a Military Police Watch Commander at Camp Lejeune, North Carolina, where I oversaw policing and security operation aboard Marine Corps Base Camp Lejeune.

2. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Tramaine Marvin RANDALL (hereinafter, "RANDALL")

1

violated Title 7, United States Code, 2156(b) (possessing or training animals for participation in animal fighting venture).

3. Through training and investigations of animal fighting offenses, I am familiar with the actions, traits, habits, and terminology used by handlers or owners of dogs involved in animal fighting ventures. I have also participated in investigations of suspected animal fighters.

4. The information contained in this affidavit is based upon my personal knowledge, my review of documents and records as described below, my training and experience, as well as information provided to me by a confidential human source ("FBI CHS") and other law enforcement personnel during this ongoing investigation. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Rather, I have included only the facts that are sufficient to establish probable cause for the issuance of a criminal complaint against RANDALL for the above-described criminal violations. Where statements of others are set forth in this affidavit, they are set forth in substance and in part. In addition, the events described in this affidavit occurred on or about the dates provided herein.

## BACKGROUND ON DOG FIGHTING

5. The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal (*i.e.*, fight an animal) in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7

U.S.C. § 2156(b). Each of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(i); 18 U.S.C. § 49.

6. The Animal Welfare Act states, "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." *Id*. Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id*.; 28 U.S.C. § 2461.

7. The remaining paragraphs in this section of the affidavit are based on my training and experience investigating animal fighting ventures, and on information provided to me by other law enforcement personnel who have extensive experience in investigative animal fighting ventures. In the United States, dog fighting ventures involve "pit bull"-type dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dog fight occurs when two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

8. Dog fighting typically involves pit bull-type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

9. Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. They maintain contact with other dog fighters around the country and can generate substantial income from

3

gambling on dog fights and from the sale and breeding of fighting animals. It is common for successful dog fighters to sell Champions and Grand Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

10. Some dog fighters are selective about who they will sell fighting dogs to, because the success of that dog in the fighting ring will reflect on the seller whose "bloodline" is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (i.e., winning three or more dog fights) is bestowed the "Register of Merit" ("ROM") or "Producer of Record ("POR") title. This provides incentive to the seller to sell dogs to capable dog fighters, with the intention that the dogs will be fought.

11. It is common for those operating dog fighting ventures to maintain "pedigrees," books, records, ledgers, and journals relating to the possession, purchase, transportation, sale, breeding, and training of fighting dogs. These materials exist in both hard and electronic copy. The "pedigree" of a fighting dog shows the dog's name, with reference to the dog fighting "kennel," as well as breeding lineage going back multiple generations, with references to the number of fights won by that dog and its predecessors. Pedigrees are important in the dog fighting "industry" because they allow dog fighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits. Dog fighters also often maintain ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

12. Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting

4

for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the "bloodline" of these dogs for fighting purposes. Dog fighters such as the individuals described in this affidavit keep such dogs solely for fighting purposes.

13. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process which dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, legal and illegal, including steroids to build muscle mass and aggression. Animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

14. Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries.

15. The most common way that a dog fighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog. A "roll" is a dog fight conducted for purposes of "gametesting" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

5

16. Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight. Dog fighters refer to dogs who do not demonstrate fighting instinct by the time they reach maturity as "cold" or "shy." Because such dogs have no value to a dog fighting operation, they are often "culled," to use a word employed by dog fighters. To avoid public scrutiny, dog fighters typically do not sell these dogs to non-dog fighters or take them to an animal shelter. "Culling" generally results in the death of these animals. Federal agents are aware of dog fighting targets and defendants having killed dogs by shooting them, strangling them, bludgeoning them, or drowning them.

17. It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. First, dog fighters maintain a stock of dogs at different weights and both sexes because, in dog fights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match solicited by an opponent. Second, dog fighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting "bloodline."

18. Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dog fighters also routinely test and "roll" their dogs, including against their own dogs.

19. Dog fighters sometimes breed their own fighting dogs from dogs they already own, and sometimes buy fighting dogs from other dog fighters, either as adult dogs or puppies. When

dog fighters acquire dogs from other dog fighters, they sometimes do so in order to integrate desired fighting traits or "bloodlines" from other dog fighters into their own stock.

20. Dog fights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match" or "show." The owners or handlers agree upon: (1) the sex and weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

21. It can be challenging for dog fighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dog fighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often "call out a weight" to known dog fighters in several states, to increase their odds of finding a match. "Calling out a weight" is done by telephone, text message, e-mail, or other electronic communication. It is an integral practice without which many dog fights would not occur.

22. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place in a dog fighter's "yard" or indoors away from public view, such as in a basement.

7

23. Because of their conditioning and training, dogs used in animal fighting ventures are housed separately from other dogs—in pens, cages, or on chains—so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

24. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

25. Although dogs used for fighting are often housed outside, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity 8 rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

26. Underground dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online and electronically distributed versions of published magazines that serve the same purpose.

**PROBABLE CAUSE**

27. The FBI has used a particular CHS for narcotics and dog fighting investigations, whose information is considered reliable, as the CHS has provided accurate information that law enforcement subsequently corroborated by other investigative techniques.

28. The CHS is acquainted with RANDALL in the context of dog fighting and has known RANDALL since approximately 2014. RANDALL was the CHS's former dog fighting partner from 2014 to 2017.

29. On or about July 14, 2024, at the direction of law enforcement, the CHS attended a dog fighting event located at 712 NW 2nd Terrace, Deerfield Beach, Florida, which was audio and video recorded. The recording shows unidentified males constructing a dog fighting box/ring using plywood and carpeting. Two dogs, which appeared to be pit-bull mix, were then placed into the ring to fight. During the dog fighting event, there was blood visible on the carpeting of the box/ring. The recording shows RANDALL, in a white T-Shirt with tan lettering, as an attendee of the dog fighting event. A screenshot depicting RANDALL recording the dog fight on his cellular phone is below:



30. On or about October 8, 2024, RANDALL sent the CHS videos of a recent dog fighting event RANDALL had attended via WhatsApp. Both videos showed two dogs, which appeared to be pit-bull mix, fighting in a box/ring made of plywood and carpeting.

31. In the videos that RANDALL sent to the CHS, there were unidentified males surrounding the ring cheering on the dogs using phrases such as, "I didn't come to fight, I came to kill" and "it's going to be a bloodbath" as the dogs fought one another.

32. On or about December 14, 2024, at the direction of law enforcement, the CHS met with Alexander Eugene Benefield ("BENEFIELD"), whom the CHS had been acquainted with in the dog fighting context since at least 2016, regarding a recent dog fighting event that BENEFIELD and RANDALL had attended. The meeting was audio and video recorded. During the meeting, BENEFIELD indicated RANDALL's dog beat BENEFIELD's dog in the fight, and BENEFIELD stated he had to stop the fight for the fear of losing his dog.

33. On or about December 16, 2024, at the direction of law enforcement, the CHS called RANDALL's phone number ending in 6401 to arrange a time to meet regarding a December 11, 2024 dogfight. The CHS met with RANDALL at 721 NE 45th Court, Pompano Beach, Florida 33064 (the "RANDALL's RESIDENCE"), which was audio and video recorded. The CHS went to meet with RANDALL to discuss a dog fighting event that occurred on December 11, 2024. After arriving, the CHS requested to see fighting dogs. RANDALL then showed the CHS a dark-colored dog that appeared to be a pit bull. Following the meeting with RANDALL, the CHS departed RANDALL's RESIDENCE.

***January 14, 2025 Search Warrant***

34. On January 14, 2025, law enforcement executed a federal search warrant at RANDALL's RESIDENCE. The search revealed approximately ten pitbull-type dogs housed in

10

separate cages in the backyard of RANDALL's RESIDENCE. Law enforcement also found one French bulldog in a cage in the same area of the yard.

35. Agents observed multiple dogs with scarring consistent with dog fighting. Further, agents observed at least one dog that was actively bleeding. The bloodied dog can be seen in the photograph below:



36. Law enforcement observed numerous items in the backyard of RANDALL's RESIDENCE consistent with the training, breeding, and housing of fighting dogs, to include the items discussed below.

37. Agents discovered bottles of antibiotics, muscle gaining dog treats, products used to heal animal wounds, as well as performance enhancing supplements specifically for dogs. Agents also discovered multiple used syringes surrounding the dog cages and in close proximity to where the supplements and medications were found.

38. Additionally, agents discovered two used "break" sticks near the occupied dog cages. A "break" stick is generally used to pry open a dogs' jaws to control a fight between dogs. One "break" stick appeared to have visible blood and bite marks.

39. Law enforcement also observed a dog training device known as a "spring pole" hanging from a tree. I know that spring poles are used to strengthen the dogs' bite. A photograph of the spring pole is depicted below:



40. Law enforcement further observed a hanging scale to weigh the dogs. I know dogfighters commonly use scales such as these to weigh the dogs to determine whether they will make the agreed upon fighting weight for dogfights.

41. In the backyard of RANDALL's RESIDENCE, law enforcement also observed approximately five treadmills and slat mills. Slat mills are manually powered and do not require electricity. I know that slat mills and treadmills are commonly used by dog fighters to condition dogs for dogfighting to improve endurance.



42. Law enforcement also found approximately two weighed vests and one weighted collar for dogs on or in close proximity to the slat mill. I know these are often used as training aids to be used for dogs running on the treadmills.

43. At least one of the slat mills appeared to be manufactured by Paw Paw's based on the logo on the machine. Open source research revealed Paw Paw's ships to the United States from California.

## CONCLUSION

44. Based on the above statements, I respectfully submit there is probable cause to believe that Tramaine Marvin RANDALL committed the offense of illegal possession and training of dogs intended to be used in an animal fighting venture, in violation of 7 U.S.C. § 2156(b).

Respectfully submitted,

_____
Hunter I. Sargent, Special Agent
Federal Bureau of Investigation

Pursuant to Federal Rule of Criminal Procedure 4.1, the contents of the present affidavit were telephonically sworn to before me on this __15th__ day of January, 2025.

_____
HONORABLE JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 25-mj-6022-STRAUSS

### BOND RECOMMENDATION

DEFENDANT: **TRAMAINE MARVIN RANDALL**

**PTD**

**(Personal Surety)** (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Alexandra D. Comolli

Last Known Address: **721 NE 45th Court**

**Pompano Beach, Florida 33064**

What Facility: _____

Agent(s): **SA Hunter Sargent**
Federal Bureau of Investigation